IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CARRIE HOWARD-JOHNSON                                        PLAINTIFF


        v.                        CIVIL NO. 18-2181


ANDREW M. SAUL,[1] Commissioner
Social Security Administration                              DEFENDANT


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Carrie Howard-Johnson, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

I.      Procedural Background:

Plaintiff protectively filed her current applications for DIB and SSI on March 17, 2016, and April 21, 2016, respectively, alleging an inability to work since August 12, 2014, due to post-traumatic stress disorder (PTSD), back problems, depression, seizures, anxiety, migraines, restless leg syndrome and thyroid problems.  (Tr. 80-81, 252, 259).  An

---

[1] Andrew M. Saul, has been appointed to serve as Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

administrative hearing was held on May 15, 2017, at which Plaintiff appeared with counsel and testified. (Tr. 37-77).

By written decision dated April 25, 2018, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 17). Specifically, the ALJ found Plaintiff had the following severe impairments: osteoarthritis/degenerative disc disease of the cervical and thoracolumbar spine; left hip osteoarthritis; arthralgia; restless leg syndrome; peripheral neuropathy; left carpal tunnel syndrome; obstructive sleep apnea; migraines; hypothyroidism; pseudoseizures; major depressive disorder; and PTSD.  However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 18).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb, ramps and stairs, she can never climb ladders, ropes or scaffolds, and she can occasionally balance, stoop, kneel, crouch and crawl. She can frequently, but not constantly, reach and handle bilaterally.  She must avoid concentrated exposure to hazards including no driving as part of work. She can further perform unskilled work where interpersonal contact is incidental to the work performed, tasks are no more complex than those learned and performed by rote, with few variables and little judgment, and the supervision required is simple, direct, and concrete.

(Tr. 20).  With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a machine egg washer, a bench hand and a garment sorter.

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on August 31, 2018.  (Tr. 1-6).  Subsequently, Plaintiff filed this action. (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (Docs. 17, 18).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time administrative hearing on May 15, 2017, Plaintiff testified that she was forty-eight years of age and had obtained a high school education and five semesters of college. (Tr. 41). Plaintiff's past relevant work consists of work as an administrative manager, a construction planner and estimator specialist, a data entry clerk, and a clerical assistant. (Tr. 65-66).

The medical evidence during the relevant time period reflects the following. On April 28, 2015, Plaintiff was seen by Dr. Rebecca Floyd to establish care. (Tr. 524-527). Plaintiff complained of heavy periods, symptoms of PTSD, depression and fatigue. Upon examination, Dr. Floyd noted Plaintiff was well-appearing, ambulated without difficulty, had normal memory but a depressed mood. Lexapro was prescribed. Plaintiff was scheduled to undergo a pelvic ultrasound and lab work. Plaintiff was to return for a follow-up in one month.

On May 28, 2015, Plaintiff was seen by Dr. Floyd to discuss her recent lab results. (Tr. 522-523). Dr. Floyd noted Plaintiff reported feeling very fatigued but her lab work showed no reason for this symptom. After further discussion, Dr. Floyd opined Plaintiff was very depressed. Plaintiff was started on a trial of Pristiq.

On June 29, 2015, Plaintiff was seen by Dr. Floyd for her depression. (Tr. 520-521). Plaintiff reported she was doing better on Pristiq. Plaintiff reported having a problem with heavy periods. Upon examination, Dr. Floyd noted Plaintiff was well-appearing and in no distress. Plaintiff had intact recent and remote memory and a normal mood and affect. Plaintiff was referred to a gynecologist.

3

On August 24, 2015, Plaintiff was seen by Dr. Floyd. (Tr. 518-519). Plaintiff reported left hip pain. Plaintiff reported she fell a few months ago and that recently the hip she fell on started to hurt more. Plaintiff also reported difficulty with her back but was convinced her hip was the problem. Upon examination, Dr. Floyd noted Plaintiff was well-appearing and ambulated without difficulty. Plaintiff exhibited decreased range of motion of her hip secondary to pain. Plaintiff was assessed with hip pain. Dr. Floyd recommended Plaintiff take Aleve and referred Plaintiff to an orthopedist.

On September 17, 2015, Plaintiff was seen by Dr. Trent Johnson for an evaluation of her left hip. (Tr. 417). Plaintiff reported she had experienced hip pain for several years, and that the pain worsened after she slipped and fell on ice in 2013. Plaintiff also reported left-sided back pain. X-rays revealed minimal signs of osteoarthritis. After examining Plaintiff, Dr. Johnson referred Plaintiff for an epidural steroid injection.

On October 13, 2015, Plaintiff was seen by Dr. Floyd. (Tr. 516-517). Plaintiff reported having difficulty sleeping. Plaintiff also wondered if she had restless legs because she was unable to keep her legs still when she was in bed. Plaintiff also appeared depressed and was encouraged to be seen at Western Arkansas Guidance Center. Upon examination, Dr. Floyd noted Plaintiff was well-nourished and ambulated without difficulty. Plaintiff exhibited pressured speech and an anxious depressed mood. Plaintiff was to follow-up in six months.

On October 27, 2015, Plaintiff was seen by Dr. Brian T. Goodman for a lumbar epidural steroid injection. (Tr. 414-416, 545-550). Dr. Goodman noted that Plaintiff reported feeling healthy overall and was ready to proceed with the injection.

On November 24, 2015, Plaintiff was seen by Dr. Johnson for right back pain and numbness and tingling in her right leg. (Tr. 413-414). Dr. Johnson noted Plaintiff underwent

4

an epidural injection one month ago. Plaintiff reported a significant worsening of pain after the injection. Plaintiff continued to complain of significant radicular symptoms, worse when walking, down her right lower extremity. Plaintiff also reported some pain at rest and difficulty sleeping. Dr. Johnson recommended a MRI of the lumbar spine.

On December 8, 2015, Plaintiff underwent a MRI of the lumbar spine that revealed a small right lateral disc protrusion at the inferior recess at L4-5; a diffuse mild disc bulge at L5-S1; and facet arthropathy. (Tr. 552-554).

On December 11, 2015, Plaintiff was seen by Dr. Johnson for a follow-up for her lumbar spine. (Tr. 412). Plaintiff complained of numbness and tingling in her right leg. Plaintiff reported she was in constant pain. Dr. Johnson noted Plaintiff had tried a lumbar epidural steroid injection which Plaintiff claimed had worsened her pain. After examining Plaintiff and a recent MRI, Dr. Johnson referred Plaintiff to a neurosurgeon for an evaluation.

On January 15, 2016, Plaintiff underwent a diagnostic impression with Susan Smith. (Tr. 665). Ms. Susan noted Plaintiff was struggling with depression, anxiety and PTSD feelings. Plaintiff felt her physical problems had caused her mental health symptoms to surface. Ms. Smith noted Plaintiff's hygiene was good but noted Plaintiff's report that she would sometimes go long periods without a shower. Plaintiff reported difficulty going out in public. Plaintiff reported the only good thing in her life were her grandbabies. Ms. Smith recommended Plaintiff undergo a full psychiatric evaluation and participate in therapy.

On February 22, 2016, Plaintiff was seen by Dr. Joseph W. Queeney. (Tr. 408-411, 481-486). Plaintiff complained of constant low back pain since June of 2015, after a fall. Plaintiff reported her legs went numb and she fell down six steps. Plaintiff also reported falling in December of 2013, and January of 2014. Upon examination, Dr. Queeney noted Plaintiff

had poor effort and give away weakness of the lower extremities in all major muscle groups. Plain x-rays were noted as essentially normal, as was a MRI. Plaintiff was assessed with chronic low back pain. Dr. Queeney noted he would not recommend surgery for Plaintiff. Plaintiff was to follow-up with her primary care physician.

On March 2, 2016, Plaintiff underwent a psychiatric evaluation. (Tr. 653-658). Plaintiff complained of PTSD. Plaintiff reported that she was not happy, was quick tempered and was terrified of storms after helping with the Joplin tornado. Plaintiff reported she lived alone but was staying with her parents. Plaintiff was assessed with depression and anxiety and started on medication and individual therapy was recommended.

On March 30, 2016, Plaintiff was seen by Dr. Brian J. Ipsen. (Tr. 395-397). Plaintiff complained of low back pain with bilateral leg numbness/tingling. Plaintiff reported her pain was worse with activity. Plaintiff indicated the pain was better with physical therapy for a while but the pain returned. Plaintiff said the neurosurgeon blew her off. After examining Plaintiff, x-rays and a MRI of the lumbar spine, Dr. Ipsen diagnosed Plaintiff with peripheral neuropathy, idiopathic low back pain and lumbar radiculopathy. It was recommended that Plaintiff undergo electrodiagnostic testing of the upper and lower extremities, cervical and thoracic spine MRIs, physical therapy and that Plaintiff be referred to a neurologist.

On April 12, 2016, Plaintiff was seen by Kellie Berry-Hert, APN, for a medication check. (Tr. 652). Plaintiff reported recent storms had caused increased anxiety. Plaintiff reported the Seroquel was helping with sleep but she still had some nightmares. Plaintiff was to return in two months.

On April 18, 2016, Plaintiff was seen by Darren S. Pledger, PT, for an initial physical therapy evaluation. (Tr. 567-573). Plaintiff reported her pain started in December of 2013,

after falling on ice. Plaintiff reported she fell down some stairs in June of 2015. Plaintiff reported constant pain in her low back and numbness in both arms and legs. Plaintiff indicated her activity was severely limited due to her condition. Mr. Pledger observed Plaintiff's guarded gait. Plaintiff's sensation was found to be inconsistent with testing and distraction relieved her pain slightly. Mr. Pledger noted Plaintiff was irritable so he was unable to perform a full detailed evaluation. Plaintiff was to attend therapy twice a week for six weeks.

On April 20, 2016, Plaintiff was seen by Kayla Brunk, PT Assist., for physical therapy. (Tr. 406-408, 574-577). Ms. Brunk noted treatment started late due to a late check-in by Plaintiff. Plaintiff reported her arms were tingly. Plaintiff reported right leg cramping and a burning sensation during traction.

On April 26, 2016, Plaintiff was seen by Mr. Pledger for physical therapy. (Tr. 404-405, 577-580). Plaintiff reported she felt better after her last treatment and was moving around better. Mr. Pledger noted Plaintiff reported increased soreness because she had overdone it the previous weekend.

On May 2, 2016, Plaintiff was seen by Brandi M. Grubbs, PT Assist., for physical therapy. (Tr. 580-583). Plaintiff reported she fell on April 30th, which caused increased low back pain along with cervical spine pain.

On May 4, 2016, Plaintiff underwent a MRI of the cervical spine that revealed multilevel disc degeneration particularly at C5-6; dorsal bony ridging and disc protrusion C5-6 with mild spinal canal stenosis, mild bilateral foraminal stenosis at this level also due to uncovertebral spurring and lateral extension of disc protrusion; and minimal central disc protrusion C6-7 without spinal canal or foraminal stenosis. (Tr. 555-562). A thoracic spine MRI revealed mild degenerative changes at multiple levels; a small central disc protrusion T6-

7 without spinal canal stenosis; small nerve root sleeve cysts at multiple levels, most pronounced on the left T7-8, which were noted as usually of no clinical significance.

On May 6, 2016, Plaintiff had a physical therapy session with Mr. Pledger. (Tr. 584-590). Plaintiff reported she was feeling much better and was no longer sore from her fall. Mr. Pledger noted Plaintiff was able to perform the exercises well but was extremely fatigued with very basic exercises. Plaintiff reported she felt a little better since starting therapy and was more flexible.

On May 9, 2016, Plaintiff was seen by Dr. Christopher Andrew for electrophysiologic studies of all extremities. (Tr. 563, 639-645). After reviewing the results, Dr. Andrew assessed Plaintiff with spondylosis of the cervical region without myelopathy or radiculopathy, spondylosis of the lumbar region without myelopathy or radiculopathy, and carpal tunnel syndrome on the left. Dr. Andrew further stated:

> This study is normal and shows no evidence of active or chronic cervical or lumbar radiculopathy. There is no evidence of neuropathy. She has a mild left carpal tunnel syndrome. No evidence of other entrapment neuropathies. No evidence of myopathy.

(Tr. 645).

On May 11, 2016, Plaintiff had a physical therapy session with Lisa D. Hodges, PT Assist. (Tr. 590-593). Plaintiff reported her pain was a 9/10. Ms. Hodges noted Plaintiff had seen a neurologist recently. Ms. Hodges noted that Mr. Pledger stated it was okay to do anything with Plaintiff as she had been cleared neurologically. Plaintiff participated in basic stretching and core strengthening during the session.

On May 13, 2016, Plaintiff had a physical therapy session with Ms. Hodges. (Tr. 593-596). Plaintiff reported her pain was a little better. Ms. Hodges noted Plaintiff exerted good effort with all exercises.

On May 18, 2016, Plaintiff was seen by Dr. Margaret V. Cox to establish care. (Tr. 497-500). Plaintiff complained of right-sided numbness that came and went. Plaintiff reported this usually occurred in her hip. Plaintiff reported she had thought it was back pain but multiple specialists found nothing in her back to account for the pain. Plaintiff also reported numbness in her upper extremities, bilaterally, and lower extremity numbness that impacted her ability to walk well. Plaintiff also reported PTSD that stemmed from her work in disaster relief. Dr. Cox noted she had reviewed Plaintiff's recent nerve conduction study that revealed mild left carpal tunnel. Upon examination, Dr. Cox noted Plaintiff had slightly decreased grip strength and slightly decreased leg strength. Plaintiff also walked with a limped gait. Dr. Cox ordered lab work and asked Plaintiff to return in three weeks.

On May 20, 2016, Plaintiff was seen by Angela M. Sawyer, PT, for physical therapy. (Tr. 597-600). Plaintiff reported her pain was 10/10 but she refused to go to the emergency room. Plaintiff reported she had been compliant with her home exercise plan but had not experienced a decrease in pain. Plaintiff reported she was going to a new primary care physician who wanted more lab work. Ms. Sawyer noted after treatment Plaintiff reported her pain was still 10/10 but Plaintiff was not demonstrating pain behaviors. Plaintiff was instructed to pay attention to her technique when performing the exercises.

On June 8, 2016, Plaintiff returned to Dr. Cox for a follow-up appointment. (Tr. 501-503). Dr. Cox noted Plaintiff's complaint of intermittent numbness in her upper and lower extremities. Plaintiff denied any major issues besides feeling fatigued and the neuropathy. Plaintiff felt her PTSD might play a role in her fatigue. Plaintiff denied myalgias, back pain or joint swelling, but affirmed weakness and numbness. Upon examination, Dr. Cox noted Plaintiff exhibited normal range of motion and a slightly decreased grip strength in both arms.

9

Plaintiff was noted to have a normal mood and affect. Plaintiff was assessed with numbness and tingling and weakness. Dr. Cox recommended a MRI to rule out MS and referred Plaintiff to neurology.

On June 10, 2016, Plaintiff was seen by Nurse Berry-Hert for a medication check. (Tr. 651). Plaintiff reported she was doing better but still had some nightmares. Plaintiff reported she would be having a MRI to rule out MS. No changes were made to her medication and she was to return in three months.

On June 14, 2016, Dr. Bill F. Payne, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk for a total of six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative and environmental limitations were not evident. (Tr. 89-90). On January 20, 2017, after reviewing the records, Dr. Alice M. Davidson affirmed Dr. Payne's opinion. (Tr. 126-128).

On July 21, 2016, Dr. Christal Janssen, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was moderately limited in some areas of functioning. (Tr. 91-92). On the same date, Dr. Janssen completed a Psychiatric Review Technique assessment opining that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (Tr. 87-88). On January 20, 2017, after reviewing the records, Dr. Laurie Clemens affirmed Dr. Janssen's opinion. (Tr. 150-151).

10

On June 22, 2016, Plaintiff underwent a MRI of the brain that revealed no significant intracranial abnormality. (Tr. 510-511, 564-566).

On July 20, 2016, Plaintiff was seen by Dr. Terry L. Efird for a consultative mental diagnostic evaluation. (Tr. 467-470). Plaintiff reported she applied for disability benefits secondary to back problems, difficulty getting along with others and taking longer to get things done. Plaintiff also endorsed depression. Plaintiff also alleged PTSD. Regarding the PTSD, Plaintiff reported she was in the tornado that hit Joplin in 2011. Upon further discussion, Dr. Efird noted Plaintiff was actually in a town ten miles away from where the tornado hit. Plaintiff reported distressing dreams and intrusive thoughts. Plaintiff reported she was receiving out-patient services and that her current medications were beneficial. Plaintiff endorsed the ability to perform basic self-care tasks independently; and to perform household chores adequately most of the time. Dr. Efird assessed Plaintiff with major depressive disorder, moderate and PTSD.

With respect to adaptive functioning, Plaintiff endorsed the ability to drive unfamiliar routes. Plaintiff reported her ability to shop independently was impaired by anxiety. Plaintiff reported her ability to handle personal finances was impaired by not calculating information accurately or forgetting due dates. Plaintiff reported the ability to perform most activities of daily living adequately for the most part. Plaintiff reported she saw her grandchildren weekly and talked to a friend twice per week. Dr. Efird opined Plaintiff had the capacity to perform basic cognitive tasks required for basic work like activities.

On August 5, 2016, Plaintiff was seen by Dr. Cox for a follow-up appointment. (Tr. 504-506, 673-674, 688-691). Dr. Cox noted Plaintiff recently went to a neurologist and it was recommended that Plaintiff obtain control of her arthralgias and maybe start therapy. Plaintiff

reported she was open to water therapy. Plaintiff indicted that her joints hurt all over off and on. Plaintiff reported her migraines were getting the best of her. Plaintiff explained she had to be taken off of Imitrex because of some psychiatry medication. Plaintiff reported chronic fatigue. After examining Plaintiff, Dr. Cox assessed Plaintiff with primary hypothyroidism, a tick bite and chronic joint pain. Plaintiff was started on medication for the tick bite. Plaintiff was going to start water therapy and continue with psychiatry. Dr. Cox opined Plaintiff's fatigue might be linked to her PTSD.

On August 24, 2016, Plaintiff had a physical therapy initial evaluation and plan of care performed by Diane Hubbard, PT. (Tr. 600-605). Plaintiff reported her pain was an 8/10, and that she had not taken pain medication. Plaintiff reported her pain went down her back and into her legs. Plaintiff reported some days she had shooting pain while other days she felt tingles and numbness. It was recommended that Plaintiff attend therapy two times a week for twelve weeks.

On September 7, 2016, Plaintiff was seen by Teresa Bagwell, PT Assist., for physical therapy. (Tr. 606-608). Ms. Bagwell noted Plaintiff performed all exercises without grimacing this time.

On September 14, 2016, Plaintiff was seen by Nurse Berry-Hert for a medication check. (Tr. 650). Plaintiff reported that Seroquel caused restless legs so she stopped taking it. Plaintiff reported good days and bad days. Plaintiff reported she did not sleep well and continued to have nightmares. Plaintiff's medication was adjusted and she was to return in one month.

On September 20, 2016, Plaintiff was seen by Ms. Bagwell, PT Assist., for physical therapy. (Tr. 608-610). Plaintiff arrived ambulatory with no assistive device. Ms. Bagwell noted Plaintiff performed all exercises without grimacing.

On October 3, 2016, Plaintiff was seen by Demi Delise Nesbitt, APRN.  (Tr. 507-510, 674-677).  Plaintiff complained of sinus pressure and congestion for the past month.  Plaintiff reported she had attended water therapy for her chronic joint pain but had missed a few sessions due to her congestion.  Plaintiff reported she had a lot of pain with swelling in her hands and ankles. Nurse Nesbitt noted Plaintiff had normal range of motion of her neck and back. Plaintiff was noted to have normal strength and sensation throughout.  Plaintiff was assessed with sinusitis and chronic joint pain.  Plaintiff was encouraged to continue water therapy.

On October 4, 2016, Plaintiff was seen by Ms. Misty D. McBride, PT Assist., for physical therapy. (Tr. 610-612).  Plaintiff arrived ambulatory without an assistive device. Ms. McBride noted Plaintiff complained of continuous pain in her left hip throughout the treatment. Plaintiff had multiple open sores on her arms and legs, bilaterally, and reported they were from frequent falls.

On October 6, 2016, Plaintiff was seen by Ms. Hubbard for physical therapy.  (Tr. 612-614).  Ms. Hubbard noted Plaintiff arrived ambulatory with no assistive device.  After traction, Plaintiff reported she felt a lot better.

On October 12, 2016, Plaintiff was seen by Russell Griffith, PT Assist., for physical therapy.  (Tr. 615-616).  Plaintiff reported a decrease in falling.  Mr. Griffith noted Plaintiff arrived ambulatory without an assistive device.  Plaintiff reported she felt a lot better after traction.  Plaintiff also had some aquatic therapy and reported her pain went away completely when floating with noodles.

On October 14, 2016, Plaintiff was seen by Mr. Griffith for physical therapy.  (Tr. 617-619).  Mr. Griffith noted Plaintiff arrived ambulatory without an assistive device.  Mr. Griffith

noted Plaintiff tolerated extension exercises a little better but had increased pain during flexion exercises.

On October 18, 2016, Plaintiff was seen by Nurse Berry-Hert for a medication check. (Tr. 649). Plaintiff reported the Remeron was helpful but she continued to wake up at three in the morning. Plaintiff expressed frustration with still living with her parents and brother with CP. Plaintiff reported severe back problems and that she had been falling. Plaintiff's depression was not much improved. Nurse Berry-Hert noted sirens in town triggered Plaintiff's PTSD and anxiety. Plaintiff requested medication for severe anxiety. Medication adjustments were made and Plaintiff was to return in one to two months.

On October 26, 2016, Plaintiff was seen by Mr. Griffith for physical therapy. (Tr. 620-621). Plaintiff arrived ambulatory without an assistive device. Mr. Griffith noted Plaintiff had pain during some of the exercises. Plaintiff tolerated the extension exercises a little better, but had increased pain during all exercises.

On October 27, 2016, Plaintiff was seen by Mr. Griffith for physical therapy. (Tr. 622-623). Plaintiff arrived ambulatory without an assistive device. Plaintiff tolerated the extension exercises a little better, but had increased pain during all exercises.

On November 18, 2016, Plaintiff was seen by Dr. Cox for a follow-up. (Tr. 677-679, 692-694). Plaintiff reported she tried to do water therapy but it was actually more painful. Plaintiff indicated she was having a lot of muscle spasms and restless legs. Plaintiff reported her PTSD had flared and that she was tired. Plaintiff indicted she struggled with joint pain and that she hurt all over. Plaintiff also reported a worsening of hand and foot numbness. Upon examination, Dr. Cox noted Plaintiff exhibited musculoskeletal tenderness but no edema. Plaintiff exhibited decreased range of motion in her neck and back. Dr. Cox noted Plaintiff

14

reported pain upon touch in her upper back and extremities. Plaintiff was noted to have a normal mood and affect. Dr. Cox referred Plaintiff to rheumatology for her arthralgias and dermatology for a skin check.

On December 8, 2016, Plaintiff was seen by Nurse Berry-Hert, for a medication check. (Tr. 648, 702). Plaintiff reported she was tired and had a lot of anxiety. Plaintiff also had back pain. Plaintiff reported the valium had been somewhat helpful and her sleep was improved. Plaintiff indicated her nightmares had decreased. Plaintiff thought her restless legs were worse since her doctor added Flexeril. Plaintiff felt a decrease in motivation and interest. Nurse Berry-Hert indicated she would consider changing Plaintiff's medication at a follow-up appointment in one to two months.

On December 16, 2016, Plaintiff was seen by Dr. Cox for a follow-up. (Tr. 680-682). Dr. Cox noted Plaintiff continued to suffer from a lot of arthralgias and muscle pain. Plaintiff reported some joint pain and constant fatigue. Dr. Cox noted she could not find anything wrong with Plaintiff except for elevated inflammatory markers. Plaintiff also reported sleep problems, a lot of anxiety and depression, waking up with a headache, and numbness. Upon examination, Dr. Cox noted Plaintiff had normal range of motion. Dr. Cox noted Plaintiff was referred to rheumatology and started on Lyrica. An overnight pulse ox was recommended to test for sleep apnea.

On January 27, 2017, Plaintiff was seen by Nurse Berry-Hert for a medication check. (Tr. 647, 701). Nurse Berry-Hert noted Plaintiff declined changes to her medication. Plaintiff had just started Lyrica. Plaintiff reported she was sleeping better. Plaintiff processed frustration with her father for spending all of their inheritance money. Plaintiff was to return in two months.

15

On January 27, 2017, Plaintiff was seen by Dr. Cox. (Tr. 682-684, 694-695). Plaintiff reported she had just started Lyrica and thought it might be helping. Dr. Cox noted Plaintiff had been cleared by neurology. Plaintiff reported she was also congested. Plaintiff also reported some constipation and urinary problems. Upon examination, Dr. Cox noted Plaintiff had normal range of motion without edema. Dr. Cox noted Plaintiff's neuropathy was stable with Lyrica.

On March 27, 2017, Plaintiff was seen by Dr. Cox. (Tr. 685-687, 696). Plaintiff stated her hands swelled intermittently. Dr. Cox noted Plaintiff had carpal tunnel syndrome on the left. Plaintiff reported that she did not use wrist splints. Plaintiff reported feeling benefits from the use of the CPAP she recently started using. Dr. Cox noted Plaintiff was being treated at Valley for her significant PTSD. Plaintiff reported Lyrica helped with her neuropathy and that she would be seeing a rheumatologist in June. Dr. Cox noted Plaintiff's joint pain was from an unknown etiology. After examining Plaintiff, Dr. Cox assessed Plaintiff with acquired hypothyroidism, migraines, PTSD and numbness and tingling. Dr. Cox noted Plaintiff's migraines had been well-controlled. Dr. Cox ordered Plaintiff wrist splints. Plaintiff was to follow-up in July after her rheumatology appointment.

On March 27, 2017, Plaintiff was seen by Nurse Berry-Hert for a medication check. (Tr. 700). Plaintiff reported she was more irritable due to living with her parents and the bad weather. Plaintiff reported having had an outburst with her parents. Plaintiff also reported increased anxiety due to the stormy weather. Plaintiff's valium dosage was increased.

On June 13, 2017, Plaintiff was seen by Dr. Cox for a follow-up appointment. (Tr. 729-). Plaintiff reported sinus pain that turned into a migraine every day. Plaintiff also reported her left hand thumb and little finger were drawing together and that she fell or became

16

lightheaded at times when getting up from a seated position.  Plaintiff reported she was not wearing carpal tunnel splints and that she needed another prescription.  Upon examination, Dr. Cox noted Plaintiff exhibited musculoskeletal tenderness and a decreased range of motion of her cervical and lumbar spine.  Plaintiff was noted to have a normal mood, affect and behavior. Dr. Cox noted Plaintiff's migraine might be caused by increased stress. Plaintiff was to see a rheumatologist the next week.

In a treatment plan review dated July 7, 2017, the counselor indicated Plaintiff continued to struggle with moderate to severe symptoms of depression and anxiety/ panic.  (Tr. 719-722).  Plaintiff was noted to be making slight progress toward her treatment goals but had missed appointments due to several health problems.

On July 11, 2017, Plaintiff was seen by Nurse Berry-Hert for a medication check.  (Tr. 718).  Nurse Berry-Hert noted Plaintiff's medical physician was still trying to determine why Plaintiff's CRP was elevated.  Plaintiff reported she slept a lot and was irritable.  Plaintiff indicated she was struggling with getting used to her CPAP.  Plaintiff reported she did not use it most of the time.  Nurse Berry-Hert encouraged Plaintiff to use her CPAP, as Plaintiff's sleep apnea might be contributing to Plaintiff's inflammation.  Nurse Berry-Hert completed a Medical Source Statement Secondary to Mental Impairments opining that Plaintiff was markedly to severely limited in numerous areas of functioning.  (Tr. 708-711).

On August 14, 2017, Plaintiff was seen by Dr. Cox for a follow-up appointment.  (Tr. 731-733).  Plaintiff reported she saw a rheumatologist who did not think Plaintiff's inflammatory markers were due to anything rheumatological.  Plaintiff reported her numbness was now localized more in her legs and hands.  Plaintiff reported the numbness came and went. Plaintiff reported that when she traveled to her friend's ranch her symptoms got better.  Plaintiff

17

thought stress played a big role. Plaintiff reported she was seeing a psychiatrist at Valley but had since left. Plaintiff reported she was working on being set up with another psychiatrist. Upon examination, Dr. Cox noted Plaintiff had normal range of motion without edema. Dr. Cox questioned if Plaintiff's muscle weakness might be tied to Plaintiff's anxiety and depression.

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

## IV.   Discussion:

Plaintiff argues the following issues on appeal: 1) the ALJ made an improper RFC finding; and 2) the ALJ's step five conclusion is erroneous.

### A.   Subjective Complaints and Symptom Evaluation:

We first address the ALJ's assessment of Plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4)

dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  A review of the record revealed that during the relevant time period Plaintiff was able to take care of her personal needs, slowly; prepare simple meals; do laundry and light household chores; drive short distances; shop in stores and by computer; and visit with friends and family.  In August of 2017, Plaintiff reported she traveled away to her friend's ranch and her symptoms improved.

With respect to Plaintiff's alleged impairments, both physical and mental, the record revealed that Plaintiff was treated conservatively and appeared to experience some relief with the use of medication.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, she has not established that she is unable to engage in any gainful activity.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**B.       The ALJ's RFC Determination and Medical Opinions:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect h[er] RFC." Id.

In determining that Plaintiff maintained the RFC to perform light work with limitations, the ALJ considered the medical assessments of the non-examining agency medical consultants; Plaintiff's subjective complaints; and her medical records.  The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of treating, examining and non-examining medical professionals, as well as the "other source" medical opinion completed by Nurse Berry-Hert, and set forth the reasons for the weight given to the opinions.  Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert,

whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

With respect to Plaintiff's physical limitations, the ALJ pointed out the ability to perform this level of work is supported by the fact that Plaintiff's examining physicians placed no restrictions on her activities that would preclude performing the RFC determined during the relevant time period. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability).

With respect to Plaintiff's mental limitations, Plaintiff argues the ALJ improperly discounted the opinion of Nurse Berry-Hert who completed a Mental Source Statement opining Plaintiff had marked and severe limitations in multiple areas of functioning. After reviewing the record, the Court finds substantial evidence to support the ALJ's determination that Nurse Berry-Hert's assessment is inconsistent with her progress notes, as well as the record as a whole. Lawson v. Colvin, 807 F.3d 962, 967 (8th Cir. 2015)("Evidence provided by 'other sources' must be considered by the ALJ; however, the ALJ is permitted to discount such evidence if it is inconsistent with the evidence in the record." ). After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

**C.    Hypothetical Question to the Vocational Expert:**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds

that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a machine egg washer, a bench hand  and a garment sorter during the time period in question. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.      Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of  December 2019.


/s/   *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE